## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                 No.  CR-04-2357 MV

LEONARD MARTINE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Statements **[Doc. No. 13]**, filed January 24, 2005. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

## BACKGROUND

In a forensic interview conducted by FBI Special Agent Oscar A. Ramirez, Emily Jim, a fifteen year old juvenile, alleged that Defendant, her stepfather, had sexually abused her approximately fifty times over the course of a five year period from 1999 to 2004.  In another interview, Winona Jim, Emily's mother and Defendant's ex-wife, corroborated Emily's allegations.  In order to investigate these allegations, Agent Ramirez had Navajo Criminal Investigator ("CI") Jones R. Begay set up an interview with Defendant for October 21, 2004.

On the morning of October 21, 2004, Agent Ramirez and CI Begay drove to Defendant's house in an unmarked FBI Chevrolet Tahoe.  They parked in front of the house and knocked on the door.  Both agents were dressed in civilian clothes and neither displayed a weapon.  Agent Ramirez testified that there were several people inside of the house.  Agent Ramirez further testified that he asked for Defendant, who came to the door.  According to Agent Ramirez, he advised Defendant that

he wanted to question him regarding an FBI investigation and asked Defendant if there was anywhere in the house where they could talk privately. Agent Ramirez testified that Defendant responded that there was not, as there were too many people in the house. Accordingly, Agent Ramirez testified, he asked Defendant if he would talk to the agents inside Agent Ramirez's parked vehicle. According to Agent Ramirez, Defendant agreed and walked outside with the agents. Defendant testified that Agent Ramirez asked him to come outside and that he waited with CI Begay outside while Agent Ramirez went into the house and used the bathroom. Thereafter, Defendant testified, Agent Ramirez told him that he wanted to ask him some questions and told him to get into his vehicle.

Agent Ramirez testified that his initial contact with and subsequent interview of Defendant was conducted in English. Agent Ramirez further testified that CI Begay, who is fluent in Navajo, accompanied him to the interview in the event that Defendant needed translation assistance. According to Agent Ramirez, Defendant did not need such assistance but rather understood what Agent Ramirez was saying and in turn communicated fluently in English. CI Begay testified that, at one point during the interview, Defendant seemed to be having problems giving his statement and stopped to asked him, in Navajo, "How do I say this?" CI Begay testified that he responded, in Navajo, "You are doing well, just be honest." CI Begay testified that he had no concerns about Defendant's ability to communicate in English and that the conversation between Agent Ramirez and Defendant was understandable. According to Defendant, he did in fact turn around to the back seat and asked CI Begay for translation assistance, but that CI Begay said, "You are doing okay," which Defendant interpreted to mean that he did not want to help him.

Agent Ramirez testified that, as Defendant and the agents were walking toward the vehicle, Defendant asked why the agents wanted to interview him and he responded that they wanted to talk

to him about Winona and her daughter.  According to Agent Ramirez, Defendant's demeanor was friendly and talkative and he did not express any reservations about talking to the agents or accompanying them to the vehicle.

When they arrived at the vehicle, Defendant sat down in the front passenger seat, Agent Ramirez sat down in the driver's seat and CI Begay sat down in the back seat directly behind Defendant.  The doors and windows of the vehicle were closed.  Agent Ramirez testified that, once they were seated inside the vehicle, he first advised Defendant that the doors were unlocked, that Defendant was free to leave the vehicle at any time and that Defendant could stop talking to him at any time.  Next, Agent Ramirez testified, he informed Defendant that he wanted to interview him with regard to allegations of inappropriate touching.  According to Agent Ramirez, he asked Defendant if he knew what the word "allegations" means and Defendant replied that he did not.  Agent Ramirez testified that he told Defendant that it means that Defendant was being accused of inappropriately touching someone.  According to Agent Ramirez, Defendant's demeanor did not change at this point. Agent Ramirez testified that he next ascertained that Defendant had a tenth grade education, was mentally and physically fit for the interview and could read and write English and, thereafter, read Defendant his *Miranda* rights from an Advice of Rights form.  According to Agent Ramirez, after reading aloud each sentence on the form, he asked Defendant if he understood and Defendant indicated that he did.  Agent Ramirez testified that he placed a checkmark to the left of each sentence upon Defendant's indication that he understood that sentence.  Agent Ramirez testified that he then read aloud the Waiver of Rights provision on the bottom of the form and asked Defendant if he understood and if he had any questions.  According to Agent Ramirez, Defendant indicated that he understood and that he did not have any questions.  Defendant signed the Waiver of Rights provision

at 8:20 a.m.  Defendant testified that Agent Ramirez "did not really read the rights," but rather "just mark[ed] it off" and just told him "to sign the paper."  Defendant further testified that he did not understand what he was signing or why the agents wanted to question him.

Agent Ramirez testified that he then asked Defendant if he knew why he was being interviewed regarding allegations of sexual contact with a young female and Defendant replied that he did not.  According to Agent Ramirez, Defendant initially denied any acts of wrongdoing.  Based on Defendant's demeanor, Agent Ramirez believed that Defendant was being deceptive and, for this reason, continued the interrogation.  Agent Ramirez testified that he advised Defendant that he had information that Defendant engaged in sexual contact with Emily, provided what he described as different "scenarios" to Defendant and asked Defendant to be truthful.  According to Agent Ramirez, Defendant began providing more and more information without admitting to actual sexual contact.  At that point in the interrogation, Agent Ramirez testified, Defendant stated, "I think I might need a lawyer," and indicated that the situation was "getting serious."  Agent Ramirez testified that he remembers unequivocally that these were Defendant's exact words.  According to Agent Ramirez, at that point, he paused his interrogation and wrote down in his notes the words:  "I think I might" and "serious" so that he would remember Defendant's exact statement for his final report.  Also according to Agent Ramirez, there was a brief period of silence while he was writing down these words.  Thereafter, Agent Ramirez testified, he reminded Defendant of his *Miranda* rights and, in particular, of the fact that the interview was voluntary, and advised Defendant that it was his choice whether to continue.  Agent Ramirez further testified that he then told Defendant that the agents knew Emily's side of the story and that it would be nice to find out his side of the story.  Agent Ramirez testified that Defendant did not reach for the door or otherwise attempt to leave the vehicle

but rather, in response to Agent Ramirez's statement, began to discuss certain incidents of touching and, after a few minutes, made disclosures regarding two incidents of inappropriate sexual contact with Emily.  Agent Ramirez further testified that he did not tell Defendant that the interview was not over or attempt to prevent Defendant from exiting the vehicle.

CI Begay similarly testified that Defendant said that he might need an attorney but that it appeared that Defendant was thinking out loud rather than actually requesting to speak to an attorney.  CI Begay further testified that Defendant never asked for an attorney and said nothing else about an attorney during the interview.  According to CI Begay, Agent Ramirez did not tell Defendant that he was not done yet and Defendant did not attempt to leave the vehicle or ask to leave the vehicle.

According to Defendant's testimony, Agent Ramirez repeatedly asked him the same question about Emily and he repeatedly responded that he did not know what Agent Ramirez was talking about.  Defendant testified that he said, "I need a lawyer," and that things were "getting too far." According to Defendant, at this point, he attempted to leave the vehicle but found the door to be locked.  Defendant testified that Agent Ramirez stopped talking for a while and then said, in a mean tone of voice, "No, I haven't finished talking to you yet."   According to Defendant, he interpreted Agent Ramirez's statement to mean that Agent Ramirez would arrest him if he left the vehicle. Defendant testified that Agent Ramirez then started asking the same question again about Emily and, because he believed that Agent Ramirez would not let him leave until he admitted to the allegations of sexual abuse, Defendant admitted to those allegations. Defendant further testified, however, that his admissions were not true.  On direct examination, Defendant testified that he made the admissions because Agent Ramirez and CI Begay were forcing him to say what they wanted to hear and because

he thought the agents would not let him out of the car unless he made the admissions.  Defendant explained that he wanted to be let out of the car to go piñon picking.  On cross-examination, Defendant further testified that he made the admissions because he was upset and was not thinking clearly as his mother and grandmother had recently passed away.  Defendant also testified that he was angry that Winona and Emily were telling lies about him and, in retaliation, decided to tell lies about Emily.

Also according to Defendant, his girlfriend, Loretta Joe, approached the car at one point during the interview and Agent Ramirez lowered the right rear window.  Ms. Joe corroborated this testimony.  Defendant testified that, through the window, Ms. Joe asked how much longer the interview would take.  According to Defendant, he responded, in Navajo, that she should just wait because Agent Ramirez was not done with him.

After approximately one and one-half hours of interrogation, Agent Ramirez asked Defendant if he would give a recorded statement and Defendant agreed.  At that point, Agent Ramirez asked Defendant for permission to move the vehicle to the next house.  Defendant agreed and Agent Ramirez moved the vehicle forward approximately twenty feet.  Agent Ramirez testified that he filled out a Recorded Oral Statement form, which Defendant signed at 9:55 a.m.  Defendant testified that he signed the form but that Agent Ramirez did not read it to him, "just mark[ed] it up" and instructed Defendant to sign it.  The recording of this portion of the interview, however, demonstrates that Agent Ramirez read aloud each statement on the form and, after reading each statement, asked Defendant whether he understood the statement.  Defendant responded, on tape, that he did.  The recording further demonstrates that Defendant asked Agent Ramirez to define coercion, which word was used in the Recorded Oral Statement form and that Agent Ramirez provided a definition and

-6-

asked Defendant if he understood.  Defendant replied, on tape, that he did.  Also on the tape recording, Agent Ramirez asked Defendant if he remembered signing the Advice of Rights form and Defendant replied that he did.  According to Agent Ramirez, Defendant did not express any reservations about providing a recorded statement.

The recording of Defendant's statement lasted for approximately fifty minutes, concluding at 10:50 a.m.  Agent Ramirez testified that he continued the interrogation for this length of time because he believed that Defendant was withholding information regarding a specific incident of sexual abuse that Emily had disclosed to the agents.  According to Agent Ramirez, at the conclusion of the interview, Agent Ramirez asked Defendant if he would be willing to speak with him again and Defendant indicated that he would.  Agent Ramirez testified that Defendant then exited the car and walked back to his house.  According to Agent Ramirez, during the interview, he did not yell at or threaten Defendant or take any steps to prevent Defendant from terminating the interview.  Agent Ramirez further testified that Defendant never asked him to terminate the interview or indicated that he had been denied the right to speak to an attorney.

On November 30, 2004, Agent Ramirez arrested Defendant and brought him to the McKinley County Detention Center.  Agent Ramirez advised Defendant of his *Miranda* rights and Defendant signed the Waiver of Rights provision on an Advice of Rights form at 6:24 p.m.  Agent Ramirez testified that, before the October 21, 2004 interview, allegations had been made that Defendant might have sexually abused his younger daughter, Tyra Martine.  Agent Ramirez further testified that he chose not to confront Defendant about these allegations during the first interview because he wanted to maintain the focus of that interview on the allegations involving Emily.  During the interview on November 30, 2004, Agent Ramirez questioned Defendant about his alleged sexual abuse of both

Emily and Tyra.  According to Agent Ramirez, Defendant confirmed his earlier admissions regarding sexual contact with Emily but denied the allegations of sexual contact with Tyra.  Agent Ramirez testified that he ended the interview when Defendant said, "I need a lawyer to talk to me."

On January 24, 2005, Defendant filed the instant Motion to Suppress Statements.  The government's response in opposition followed on February 7, 2005.  The Court held an evidentiary hearing on April 28, 2005.  At the conclusion of the hearing, the Court took the motion under advisement.

**DISCUSSION**

In his motion, Defendant makes two arguments: first, that his confession was involuntary and thus must be suppressed; and second, that he clearly invoked his right to counsel and thus the subsequently procured confession is inadmissible because the agents failed to honor his request.  As set forth herein, the Court finds Defendant's arguments unavailing.

## I.   Voluntariness of Confession

A confession made by a defendant to law enforcement officers is admissible only if it is voluntary.  *See United States v. Flores*, 313 F. Supp.2d 1188, 1200 (D. Utah 2004).  The government bears the burden of establishing by a preponderance of the evidence that the defendant's confession was voluntary.  *See id.*  A confession is involuntary if "the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'"  *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)).

In evaluating the voluntariness of a confession, the Court must examine the totality of the circumstances to determine whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  *United*

*States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998).  The following factors are relevant to this determination:  "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment."  *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court clarified this totality of the circumstances test, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Id.* at 167.  The Tenth Circuit subsequently held: "it is clear after *Connelly* that a confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will."  *Erving L.*, 147 F.3d at 1249.

Where a "'mental impairment . . . should have reasonably been apparent to . . . interrogators,' then 'a lesser quantum of coercion [will] render the confession involuntary.'"  *Nickel v. Hannigan*, 97 F.3d, 403, 410 (10th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1106 (1997).  Even in such cases, however, "for a confession to be involuntary, 'the police must somehow overreach by exploiting a weakness or condition known to exist.'"  *Id.* (citation omitted).  Based on *Connelly*, "the Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect."  *Flores*, 313 F. Supp.2d at 1200.  *See Erving L.*, 147 F.3d at 1249 (providing that "[defendant's] age, mental capacity, and personal idiosyncrasies are relevant only if this court first concludes that the officers' conduct was coercive," and concluding that given the officers' courteous and non-threatening

behavior, the confession of a thirteen year old with a borderline IQ was voluntary); *United States v. Robertson*, 19 F.3d 1318 (10th Cir.) (concluding that defendant's confession was voluntary even though it was given in the hospital after waking from a coma following a car accident), *cert. denied*, 513 U.S. 906 (1994); *Nickel*, 97 F.3d at 410 (holding that even in cases where a defendant is mentally impaired and the officer is aware of the impairment, a confession will be suppressed as involuntary only if the officer uses coercive measures to take advantage of the impairment).

      In determining whether, under the totality of the circumstances, Defendant's confession was voluntary, the Court herein first must determine whether the agents who interviewed Defendant engaged in "coercive police activity." The coercive elements of the October 21, 2004 interview which Defendant alleges are as follows. Defendant contends that he was effectively surrounded in the vehicle by law enforcement agents, as Agent Ramirez was in the driver's seat and CI Begay was in the back seat. According to Defendant, the agents were abusive and threatening. Defendant testified that Agent Ramirez repeatedly asked Defendant the same question about Emily, despite his consistent response that he did not know what Agent Ramirez was talking about. Defendant testified that he thought things were "getting too far" and, for this reason, told Agent Ramirez that he "needed a lawyer." Defendant further testified that he reached for the door handle in order to leave the vehicle but found the door to be locked. Defendant also testified that Agent Ramirez stopped talking for a while and then said, in a mean tone of voice, "No, I haven't finished talking to you yet." In his motion papers, Defendant states that, during the pause in the interrogation, Agent Ramirez took notes "furiously." Defendant testified that, after the pause, Agent Ramirez resumed asking the same question about Emily. In his motion papers, Defendant alleges that Agent Ramirez's tone of voice was harsh, threatening and intimidating. According to Defendant, he interpreted Agent's Ramirez's

statement that he was not finished talking to him yet, in combination with the locked door, to mean that he was not free to leave the vehicle and that Agent Ramirez would arrest him if he attempted to do so. Defendant further testified that he believed that Agent Ramirez would not let him leave until he admitted to the allegations of sexual abuse and therefore felt forced into making the admissions. According to Defendant, although he admitted the allegations, the admissions were not true.  With regard to the second interview on November 30, 2004, Defendant contends that Agent Ramirez used the coercive technique of asking questions to which he knew the answer would be "No," *i.e.*, questions about allegations regarding Tyra, in order to force Defendant to confess to crimes against Emily.

Based on the credible evidence[1] presented at the hearing, the Court does not find that the conduct of Agent Ramirez and CI Begay amounts to coercive police activity.  Agent Ramirez and CI Begay were dressed in civilian clothing, did not display weapons and drove an unmarked vehicle. Agent Ramirez testified that he initially intended to interview Defendant in his house but that Defendant stated that there was nowhere in the house where they could talk privately.  For this reason, Agent Ramirez asked Defendant to talk to the agents in Agent Ramirez's vehicle. Defendant agreed to do so.  Given these circumstances, the fact that, throughout the interview, Agent Ramirez was next to Defendant and CI Begay was behind Defendant does not amount to a coercive environment.

---

[1]   The Court finds that Agent Ramirez was a more credible witness than Defendant. Accordingly, to the extent that there were discrepancies between the testimony of Agent Ramirez and Defendant, unless otherwise noted, the Court has resolved these discrepancies in favor of Agent Ramirez's version of the facts.

The Court is not convinced that Agent Ramirez's testimony was accurate that the doors to the vehicle were unlocked.  Nonetheless, Agent Ramirez informed Defendant that he was free to leave at any time and that he could terminate the interview at any time.  Before beginning the interrogation, Agent Ramirez advised Defendant of the purpose of the interview, ascertained Defendant's mental and physical fitness for the interview and advised Defendant of his *Miranda* rights.  Although Agent Ramirez did not have Defendant sign or initial next to each sentence on the Advice of Rights form, Agent Ramirez testified that he read aloud each sentence on the form, asked Defendant if he understood that sentence and, upon Defendant's indication that he understood, placed a checkmark to the left of that sentence.  Agent Ramirez further testified that he read aloud the Waiver of Rights provision on the form, asked Defendant if he understood or had any questions and Defendant indicated that he understood and did not have any questions.  The form reflects that Defendant signed the Waiver of Rights provision at 8:20 a.m.  In light of this evidence, Defendant's testimony was insufficient to call into question the validity of the waiver of his *Miranda* rights.

It is undisputed that Agent Ramirez repeatedly asked Defendant the same question about Emily despite Defendant's consistent denial of the allegations of sexual abuse.  Agent Ramirez, however, testified that he continued to ask the same question because, based on Defendant's demeanor, Agent Ramirez believed that Defendant was not being truthful.  Moreover, Agent Ramirez testified that, as he provided different "scenarios" to Defendant, Defendant became increasingly forthcoming.  Under these circumstances, Agent Ramirez's interrogation strategy does not amount to coercive police activity.

Defendant testified that, at one point during the interview, he expressed that things were "getting too far."  Similarly, Agent Ramirez testified that Defendant indicated that the situation was

"getting serious."  Agent Ramirez's testimony, however, demonstrates that, once Defendant said, "I think I might need a lawyer," after a brief pause during which Agent Ramirez wrote down in his notes the words "I think I might" and "serious" so that he would remember Defendant's exact statement for his final report, Agent Ramirez reminded Defendant of his *Miranda* rights and, in particular, of the fact that the interview was voluntary, and advised Defendant that it was his choice whether to continue.  Agent Ramirez further testified that he then told Defendant that the agents knew Emily's side of the story and that it would be nice to find out his side of the story.  According to Agent Ramirez, it was in response to this statement that Defendant made disclosures regarding incidents of inappropriate sexual contact with Emily.  Agent Ramirez testified that Defendant did not reach for the door or otherwise attempt to leave the vehicle and that Agent Ramirez did not tell Defendant that he was not done with the interview or attempt to prevent Defendant from leaving the vehicle.  CI Begay corroborated this testimony.  Moreover, Agent Ramirez testified that he did not yell at or threaten Defendant.  The Court notes that, during the tape recorded portion of the interview, the tone and level of Agent Ramirez's voice remained constant and was not abusive or loud.  Given this evidence, it is not credible that the agents coerced Defendant into believing that he was not free to leave the vehicle or that he would be arrested if he attempted to do so.  Similarly, although Defendant testified that he told the agents what he thought they wanted to hear so that they would let him out of the car, he also testified that he made the admissions because he was confused and upset about the recent deaths of his mother and grandmother and because he was trying to retaliate against Emily and her mother for telling lies about him.  Given the totality of Defendant's testimony, in connection with the testimony of Agent Ramirez and CI Begay, it is not credible that Defendant's admissions were the result of coercion on the part of the agents.

-13-

Nor does the evidence establish that Defendant had a unique mental impairment or weakness which the agents exploited.  While Defendant's first language is Navajo, he informed Agent Ramirez that he can speak and read English and attended school through the tenth grade.  Both Agent Ramirez and CI Begay testified that they were not concerned about Defendant's ability to communicate in English and that Defendant did not need translation assistance during the interview.  Moreover, CI Begay's testimony that Defendant looked to him for help because it was difficult to talk about the allegations rather than because he could not express himself in English was credible.

Finally, with regard to the interview subsequent to Defendant's arrest on November 30, 2004, Agent Ramirez's testimony established that there had been allegations of sexual abuse involving Tyra and that Agent Ramirez made a tactical decision to wait to raise these allegations until the second interview.  Given Agent Ramirez's testimony,  Defendant's argument that Agent Ramirez's questions about Tyra were disingenuous and designed only to elicit a confession about Emily is unavailing.

The evidence thus does not establish that the conduct of Agent Ramirez and CI Begay amounted to coercive police activity.  Accordingly, under the totality of the circumstances, the Court cannot find that the admissions made by Defendant during the two interviews were not voluntary.

## II.    Invocation of Fifth Amendment Right to Counsel

Once an individual "effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him."  *Davis v. United States*, 512 U.S. 452, 458 (1994).  In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court, however, held that if an individual "requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.*  In *Davis*, the Supreme Court clarified the *Edwards* rule as requiring courts to "determine whether

-14-

the accused *actually invoked* his right to counsel." *Id.* (emphasis in original). The Supreme Court described this as an "objective inquiry." *Id.* at 459. The Supreme Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis in original). The Supreme Court concluded that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461.

The Supreme Court "recognize[d] that requiring a clear assertion of the right to counsel might disadvantage some suspects who – because of fear, intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Id.* at 460. Despite this, the Supreme Court rejected any further prophylactic protections for an accused's Fifth Amendment right to counsel, holding instead that the primary protection is the accused's comprehension of the *Miranda* warnings themselves. In addition, the Supreme Court noted that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.* at 461. Nonetheless, the Supreme Court "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id.*

In the case before the Supreme Court in *Davis*, the defendant had stated, "Maybe I should talk to a lawyer." The Supreme Court affirmed the lower courts' conclusion that this was not a request for counsel and thus did not require that the agents stop questioning the defendant or clarify whether he in fact wanted a lawyer.

-15-

Applying *Davis*, the Tenth Circuit in *United States v. Zamora*, 222 F.3d 756 (10th Cir.), *cert. denied*, 531 U.S. 1043 (2000), held that the defendant's statement that he "might want to talk to an attorney" was ambiguous and equivocal and thus did not require FBI agents to cease questioning. *See also Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir. 2001) (defendant's query late in an interrogation asking officers whether he needed an attorney was not an unambiguous request for the assistance of counsel); *United States v. Brown*, 287 F.3d 965 (10th Cir. 2002) (where defendant indicated "yes" on a waiver of rights form when asked if he would answer questions without a lawyer present, but also answered "yes" when asked if he wanted a lawyer and if he wanted to talk to a lawyer, defendant did not invoke his right to counsel and further questioning by agents did not violate his Fifth Amendment rights).

In the instant case, Defendant stated in his motion papers that, during the interview, he said, "I should have a lawyer." During the hearing, Defendant testified that he told Agent Ramirez, "I need a lawyer." According to Agent Ramirez, however, Defendant's statement was "I think I might need a lawyer." Agent Ramirez testified that he remembers unequivocally that these were Defendant's exact words. Moreover, Agent Ramirez testified that he immediately wrote down in his notes the words "I think I might" and "serious" so that he would remember Defendant's exact statement for his final report. The evidence is undisputed that, immediately after Defendant's statement, Agent Ramirez paused his interrogation and wrote in his notes. During his testimony, Defendant did not refute Agent Ramirez's recollection of the exact language used by Defendant or testify that he unequivocally remembers using other language. Moreover, CI Begay's testimony corroborated that Defendant did not actually ask for an attorney but rather appeared to be thinking out loud. Given

-16-

Agent Ramirez's conscientious and contemporaneous notation of Defendant's words, this Court finds Agent Ramirez's recollection to be credible.

Under the relevant case law, the statement "I think I might need a lawyer" does not amount to an unambiguous or unequivocal invocation of Defendant's right to the assistance of counsel. Agent Ramirez's continued questioning of Defendant thus did not violate Defendant's Fifth Amendment rights and, accordingly, there is no basis for suppressing his subsequent confession.

<u>**CONCLUSION**</u>

Defendant's confession itself was not involuntary.   Moreover, Defendant did not unambiguously or unequivocally invoke his right to the assistance of counsel.  Accordingly, there is no basis to suppress Defendant's confession.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Statements **[Doc. No. 13]** is hereby **DENIED**.

Dated this 4th day of August, 2005.

MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Miles Hanisee

<u>Attorney for Defendant</u>:
Roger Finzel